UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RONALD L. STANTON,

               Petitioner,

v.                               CASE NO. 06-10432
                                    HONORABLE DENISE PAGE HOOD

DOUGLAS C. VASBINDER,

               Respondent.

_____/

**OPINION AND ORDER DENYING HABEAS CORPUS PETITION,
DENYING A CERTIFICATE OF APPEALABILITY,
AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Pending before the Court is petitioner Ronald L. Stanton's *pro se* habeas corpus petition under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state conviction for first-degree murder. Respondent Douglas C. Vasbinder urges the Court to deny the petition on the grounds that Petitioner's claims are procedurally defaulted, meritless, or not cognizable on habeas review. The Court agrees that Petitioner is not entitled to the writ of habeas corpus. Accordingly, the habeas petition will be denied.

**I. BACKGROUND**

    **A. The Charges and Trial**

Petitioner was charged in Jackson County, Michigan with open murder (first- or second-degree murder) and felony murder (murder committed during the attempt to commit or the actual commission of a felony). The charges arose from the fatal shooting of a young woman in 1973. The prosecutor's theory was that Petitioner raped

the woman before shooting her three times in the head.  No one was arrested for the crime initially, but in 1976, while Petitioner was incarcerated for an unrelated crime, he made some incriminating remarks about the crime.  Petitioner was charged with the crime after DNA testing became available in the 1990's and it was determined that seminal fluid found in the victim's vagina matched his DNA.

Marjorie Good testified that her daughter died in July of 1973 at the age of eighteen.  The victim had been dating a man named John Hall.  A few years before trial, the police asked Mrs. Good and her husband to provide a DNA sample.          Gerald Simon testified that he used to be a foreman for a crew, which did some work for Consumers Power.  In July of 1973, Mr. Simon and his crew were erecting steel towers on Reynolds Road in Jackson County.  He noticed a fully clothed female body lying alongside the railroad tracks.  He called his supervisor, who notified the police.

Sergeant Gary Radtke was a detective for the State Police in 1973.  On July 3, 1973, he responded to a suspected homicide on a service road that ran alongside the railroad track near Reynolds and Kirby Roads.  He observed a young woman with two bullet holes under her jaw.  There were three casings on the ground very close to her body, but the murder weapon was never found.

Dr. Arenheim conducted an autopsy on the body that same day.  He swabbed the victim's vagina, took hair and fluid samples, and removed a bullet fragment from her skull.  Sergeant Radtke obtained a copy of Dr. Arenheim's autopsy report and placed it in the file at the state police post.  The victim was later identified, and Sergeant Radtke took samples that Dr. Arenheim collected from the victim's body to a laboratory in Lansing.  At the time, the only testing that could be done was blood typing.  Dr.

2

Arenheim was no longer alive at the time of Petitioner's trial in 2000.

On April 21, 1977, Sergeant Radtke and Detective Sergeant Boyer interviewed Petitioner at a state prison where Petitioner was incarcerated on unrelated matters. After advising Petitioner of his constitutional rights, Petitioner stated that he would be willing to plead guilty to the crime if he would not receive any more time in prison. When Sergeant Boyer informed Petitioner that the State Police planned to continue working on the case, Petitioner became agitated and asked why they did not give up on the case since the victim was dead.

William Lennemann was a state trooper assigned to the Jackson post in 1973. He assisted Sergeant Radtke at the crime scene on July 3, 1973. He also attended the autopsy and facilitated the identification of the victim through dental records. Later that same year, he compiled a list of people who had bought nine-millimeter ammunition from January to the end of July 1973. On April 21, 1973, he acquired a receipt showing that Petitioner had purchased nine-millimeter ammunition on May 27, 1973. He placed the receipt in the evidence bag at the state police post.

Walter Geistel worked at the K-Mart store in Jackson, Michigan in April of 1977. He testified about the procedure used at K-Mart when someone bought ammunition. He identified his own name on a piece of paper attached to a form that K-Mart employees used when disbursing  ammunition. The purchaser's name and address and the type of ammunition purchased were listed on the form. In 1977, a state trooper contacted Mr. Geistel about the purchase of some ammunition, but he could not recall giving anything to the trooper.

The victim's boyfriend, John Hall, testified that he and the victim went on a date

3

on the night of July 2, 1973.  He last saw the victim in her sister's yard on 21st Street at

12:35 a.m. on July 3, 1973.  The next morning, the police told him what had happened.

More recently, Detective Sergeant Palmer swabbed his mouth for DNA testing.  The lab

expert later concluded that he was not the source of the DNA found on the victim.

Ronald Worsham testified that, at approximately 12:30 a.m. on July 3, 1973, he

heard screaming outside his apartment on 21st Street in Jackson.  He went to the

window and noticed the taillights of a vehicle, which he could not distinguish.  The

screaming became muffled as though the person had been taken inside the vehicle,

which drove off at a fast rate of speed.

Bernard Marrinan testified that he was a conductor and brakeman for the railroad

in July of 1973.  He noticed an older model Chevy or GMC pick-up truck parked near

Reynolds Road about 2:00 a.m. as he was passing through the area.

Petitioner's former wife, Jill Travioli, testified that Petitioner drove an older-model

greenish-blue pick-up truck in 1973.  During her marriage to Petitioner, Petitioner owned

both long guns and handguns, including a nine-millimeter gun.  Petitioner was not home

on the night of July 2, 1973.  He came home sometime during the morning of July 3,

1973.

Joan McCracken was Petitioner's and Jill Travioli's neighbor in 1973.  She

claimed that Petitioner owned an aqua-colored truck at the time.

John Robertson's hobby and occupation was identifying motor vehicles.  He

testified that the vehicle pictured in People's exhibit 18 was a 1965 Chevy pick-up truck.

Donald Krupp was a lab scientist for the Michigan Department of Public Health

Crime Lab in 1973.  He testified that DNA testing was not available in 1973.

4

Detective Sergeant Christie Palmer explained that, in 1996, one of her bosses suggested that all detectives look at their unsolved homicides and determine what physical evidence might be available for use with new technology. This case was one of several cases that she reviewed. On August 27, 1996, she found some evidence from this case in a storage facility operated by the State Police. Two slides were sent to North Carolina for DNA testing, and she took DNA samples from John Hall and Petitioner. The victim's body was exhumed on July 8, 1998, and a second autopsy was performed on it. During the autopsy, Sergeant Palmer requested bone marrow for further identification purposes. Criminal charges were filed on April 29, 1999.

David M. Larsen testified as an expert witness in firearms identification and analysis. He testified that the fired cartridge cases in evidence were nine-millimeter, Remington Peters cartridges. In 1973, he determined that an Astra or Beretta nine-millimeter semi-automatic pistol could have fired the cartridge cases and a fragment of a bullet jacket that were in evidence. He could not rule out the possibility that another firearm had been involved.

Retired state policeman Robert Piziali testified that he conversed with Petitioner at the State Prison in Jackson, Michigan on September 3, 1976. Petitioner was in custody on an unrelated matter at the time. Officer Piziali advised Petitioner of his constitutional rights and then spoke with him about the murder. Petitioner informed Officer Piziali that something was bothering him, but he did not want to talk about it unless he was guaranteed no more prison time. To determine whether Petitioner was being sincere, Officer Piziali asked him a few more questions. In response, Petitioner informed Officer Piziali that, if he had done something like that, he would have been by

himself.  Petitioner also informed Officer Piziali that the police were looking for the
wrong gun and that the gun pictured in the newspaper was not the gun used in the
crime.  He claimed that the police would be able to find the murder weapon within fifteen
minutes if he explained to them where it was and that the gun would be in working
condition.  As for ammunition, Petitioner stated that:  there were spent cartridges near
the gun which was used in the crime; the ammunition which he purchased from the K-
Mart store was not the ammunition that was used on the victim; and he could tell the
police where he purchased the ammunition.  When Officer Piziali asked Petitioner
whether he had been drunk at the time, Petitioner stated that he had been drinking, and
he did not know the victim or her boyfriend.

Dr. Kanu Virani testified that he performed an autopsy on the victim's body on
July 8, 1998.  The manner of death was homicide, and the cause of death was gunshot
wounds to the victim's head.

Petitioner did not testify or present any witnesses.  His defense was that it was
impossible for him to remember what he was doing on the day in question, which was
twenty-seven years earlier, and that the State did not prove its case beyond a
reasonable doubt.

On June 23, 2000, the jury found Petitioner guilty, as charged, of first-degree
(premeditated) murder and felony murder.  The trial court sentenced Petitioner to two
concurrent terms of life imprisonment.

## B.  The Direct Appeal and State Collateral Review

In an appeal of right, Petitioner argued that (1) the prosecution used Petitioner's
silence as substantive evidence of guilt, (2) the trial court erroneously admitted

6

testimony from Petitioner's ex-wife, (3) the jury instructions on felony murder were confusing and ambiguous, (4) the Prosecutor appealed to the jurors' sympathy, (5) there was insufficient evidence to support the convictions, (6) he was deprived of a jury on the habitual offender charge, and (7) his convictions for premeditated and felony murder violated the principle of double jeopardy.  The Michigan Court of Appeals affirmed Petitioner's conviction for premeditated murder, but vacated his conviction for felony murder on double jeopardy grounds and because there was insufficient evidence that the murder occurred during the commission of the underlying felonies (kidnapping and rape).  *See People v. Stanton*, No. 229090, 2002 Mich. App. Lexis 1365, 2002 WL 31187862 (Mich. Ct. App. Oct. 1, 2002).  Petitioner raised the first four claims enumerated above in the Michigan Supreme Court, which denied leave to appeal on May 30, 2003, because it was not persuaded to review the issues.  *See People v. Stanton*, 468 Mich. 912; 662 N.W.2d 755 (2003) (table).

On February 23, 2004, Petitioner filed a motion for relief from judgment in which he alleged that (1) the trial court deprived him of eight peremptory challenges, (2) the prosecutor made improper remarks during trial, (3) the trial court abused its discretion by admitting the autopsy report, (4) there was insufficient evidence to support his conviction, (5) he was denied sentencing credit for time served, and (6) his trial and appellate attorneys were ineffective.  The trial court denied Petitioner's motion, and the Michigan Court of Appeals denied leave to appeal the trial court's decision for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Stanton*, No. 259572 (Mich. Ct. App. July 27, 2005).  On December 27, 2005, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v.*

7

*Stanton*, 474 Mich. 978; 707 N.W.2d 205 (2005) (table).

### C. The Habeas Petition and Answer

Petitioner filed his habeas corpus petition on January 31, 2006.  His claims are:

I.      Defendant was denied his state and federal constitutional
        due process right to a fair trial where the prosecutor used
        defendant's constitutional right to remain silent as
        substantive evidence of guilt in its case in chief.

II.     The trial judge violated the rules of evidence and the
        privilege statute and committed reversible error in admitting
        over defense objection testimony by Ronald Stanton's ex-
        wife about confidential observations made while they were
        still married.

III.    Defendant was denied his state and federal constitutional
        due process rights to a fair trial because the trial court's
        instructions on felony murder did not require malice and
        because the instructions as a whole were confusing and
        ambiguous.

IV.     The prosecutor deprived Mr. Stanton of his state and federal
        constitutional due process rights to a fair trial when the
        prosecutor repeatedly appealed to the jurors' sympathy for
        the complainant.

V.      Defendant was denied his due process rights when the trial
        court applied MCR 6.412(E)(1) retroactively, denying
        Defendant 8 peremptory challenges, which violated the Ex
        Post Facto Clause of the United States and Michigan
        Constitutions.

VI.     Defendant was denied his constitutional right to a fair trial
        and due process of law due to prejudicial and improper
        prosecutorial remarks made during opening argument,
        throughout the trial, and during closing argument by making
        statements during opening argument that were not
        supported by facts presented during trial, by introducing
        evidence during closing argument that was not presented to
        the jury during trial, and by actions that both individually and
        cumulatively amounted to serious prosecutorial misconduct.

VII.    Judge Nelson abused his discretion by allowing hearsay

8

evidence to be admitted without proper foundation, an action which also violated the Ex Post Facto Clause of the United States and Michigan Constitutions as well as violating the Sixth Amendment's Due Process Clause which guarantees Defendants the right to be confronted with witnesses against them.

VIII.   Defendant was denied his right to equal protection and due process where he was unable to post bond and ultimately denied jail time credit toward his sentence contrary to legislative intent that such credit be awarded.

IX.   Defendant was denied his constitutional right to effective assistance of counsel and a fair trial due to multiple acts and omissions by trial counsel which taken as a whole and viewed in totality amounted to ineffective assistance of counsel.

X.   Defendant was denied effective assistance of appellate counsel where his appellate attorney did not raise the above issues in his appeal by right.

Because Petitioner filed only a brief statement of facts and no supporting brief, the Court will look to his state appellate briefs as support for his claims.

Respondent argues that Petitioner's claims lack merit and are barred from review by Petitioner's procedural default of failing to make the proper objections at trial or failing to raise certain issues at all levels of state court review.  The Court has found it more efficient to address the merits of Petitioner's claims than to perform a procedural default analysis.  The alleged procedural defaults, therefore, are excused.  A federal habeas court need not address a procedurally defaulted issue before deciding against a petitioner on the merits.  *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (quoting *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L.Ed. 2d 771 (1997)).

## II. STANDARD OF REVIEW

Petitioner is entitled to the writ of habeas corpus only if the state court's

adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the Supreme] Court

has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362,

412-13, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000) (Justice O'Connor's majority opinion

on Part II).  A state court's decision is an "unreasonable application of" clearly

established federal law "if the state court identifies the correct governing legal principle

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts

of the prisoner's case." *Id.*, 362 U.S. at 413.  A federal habeas court may not find a

state adjudication to be unreasonable "simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly." *Id.* at 411.

## III.  DISCUSSION

### A.  The Prosecutor's Reference to Petitioner's Silence

10

Retired state policeman Robert Piziali testified that he discussed the homicide with Petitioner on September 3, 1976, after advising Petitioner of his constitutional rights. Petitioner made some incriminating remarks during their conversation, but then said that he wanted to speak with his father before saying anything more. Officer Piziali left and returned to speak with Petitioner later that day and several other times, but they did not discuss the homicide again because Petitioner did not want to talk about it. (Tr. June 22, 2000, at 44.)

During her rebuttal argument, the prosecutor made the following remarks:

He [Petitioner] knew how to stop conversations. You heard testimony that he did that. There were times when he said, you know, "That's it. I don't want to tell you anything more until I talk to my dad. No that's it, I don't want to talk anymore."

. . . .

And, furthermore, if [sperm] was placed [in the victim's vagina] consensually, then why in the world where asked if he knew [the victim] did he say "No"? He had his chance to say that it was consent. And to that, he did not say.

(Tr. June 23, 2000, at 63-65.)

Petitioner alleges that these remarks and the prosecutor's question to Officer Piziali as to why he did not discuss the homicide with Petitioner on subsequent occasions deprived him of his constitutional right not to have his silence used as substantive evidence of guilt. The Michigan Court of Appeals determined that Petitioner did not preserve this issue for appeal by objecting on the same grounds in the trial court and that Petitioner had not demonstrated plain error affecting substantial rights.

### 1. Clearly Established Supreme Court Precedent

In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the

11

Supreme Court "held that certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence." *Dickerson v. United States*, 530 U.S. 428, 431-32, 120 S.Ct. 2326, 147 L. Ed.2d 405 (2000). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "In *Doyle* [*v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)], the Supreme Court held that, because the *Miranda* warnings contain an implicit assurance that 'silence will carry no penalty,' it would be fundamentally unfair to allow a prosecutor to use a defendant's post-*Miranda* warnings silence to impeach the explanation he offered at trial." *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008).

   *Doyle* errors are subject to harmless-error analysis. *See Brecht v. Abrahamson*, 507 U.S. 619, 622-23, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

> Harmless error review requires the court to assess whether the constitutional error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2325, 168 L.Ed.2d 16 (2007), reh'g denied, __ U.S. _, 128 S.Ct. 19, 168 L.Ed.2d 795 (2007). If [the Court is] in "grave doubt" whether the error had such an effect," that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed.2d 947 (1995). "Grave doubt" means "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435.

*Franklin,* 545 F.3d at 415.

## 2. Application

   The prosecutor's disputed comments suggested that Petitioner must be guilty because he terminated the police officer's questioning and failed to assert the defense

12

of consensual sex when given the opportunity.  Assuming that the prosecutor penalized Petitioner for invoking his right to remain silent, in violation of *Doyle*, the error was harmless.  Petitioner's DNA linked him to the crime, and he informed Officer Piziali that he would talk about the homicide if he were guaranteed no more time in prison than what he was already serving.  He went on to say that, if he were involved, he would have committed the crime by himself and the police were looking for the wrong gun.  He intimated that he could show the police where to locate the murder weapon and certain spent cartridges, and he subsequently informed two other officers that he would be willing to plead guilty to the crime if he knew he would not receive any additional time in prison.  In light of this evidence, the alleged *Doyle* errors could not have had a substantial and injurious effect on the jury's verdict and were harmless.

### B.  The Spousal Privilege

The second habeas claim alleges that the trial court violated the rules of evidence and a state statute on privileged communications by permitting Jill Travioli to testify about observations she made while she was married to Petitioner.  Ms. Travioli testified that Petitioner owned several guns during their marriage and that one of them appeared to be a nine-millimeter handgun.  Ms. Travioli also testified that Petitioner was not at home on the night of the murder.  Petitioner maintains that Ms. Travioli's observations were privileged information, which should not have been admitted in evidence.  The Michigan Court of Appeals reviewed this claim for "plain error," because, in its opinion, Petitioner did not preserve the issue by specifying his grounds for objecting on the record.

Petitioner's claim raises an issue of state law under Mich. Comp. Laws §

13

600.2162 (husband and wife as witness for or against the other) and Michigan Rule of

Evidence 501 ("Privilege is governed by the common law, except as modified by statute

or court rule.").  "[F]ederal habeas corpus relief does not lie for errors of state law."

*Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990).  "In

conducting habeas review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire,* 502

U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385  (1991).  Petitioner had no federal

constitutional right to prevent his wife from testifying against him.  *Byrd v. Armontrout,*

880 F.2d 1, 9-10 (8th Cir.1989); *United States v. Doe*, 478 F.2d 194, 195 (1st Cir.1973);

*United States v. McVeigh*, 940 F. Supp. 1541, 1565-66 (D. Colo.1996).  Consequently,

he is not entitled to habeas corpus relief on the basis of his second claim.

### C.  Jury Instructions on Felony Murder

The third habeas claim alleges that the trial court's jury instructions on felony

murder were confusing and ambiguous and did not indicate that, to be found guilty of

felony murder, the jurors had to find that he acted with malice.  The Michigan Court of

Appeals determined that Petitioner waived this issue by not objecting to the jury

instruction on felony murder and by approving of the instructions as given.  For

purposes of habeas corpus review, the issue is moot because Petitioner's felony murder

conviction was vacated on appeal.  *Faulkner v. Grayson*, Nos. 89-1367 and 89-1441,

888 F.2d 1391, 1989 U.S. App. Lexis 16946, 1989 WL 134204, at *2 (6th Cir. Nov. 8,

1989) (table).

### D.  The Prosecutor's Comments

The fourth and sixth habeas claims allege that the prosecutor's comments during

14

trial deprived Petitioner of his constitutional rights to due process of law and a fair trial.

Petitioner contends that the prosecutor's comments, individually and cumulatively,

amounted to serious prosecutorial misconduct.

### 1. Relevant Law

"Claims of prosecutorial misconduct are reviewed deferentially on habeas

review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).  To prevail on his claim,

Petitioner must demonstrate that the prosecutor's remarks, taken in the context of the

entire trial, were prejudicial and infected his trial with such unfairness as to make the

resulting conviction a denial of due process.  *Donnelly v. DeChristoforo*, 416 U.S. 637,

643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).  The misconduct must be "'so egregious

as to render the entire trial fundamentally unfair.'"  *Pritchett v. Pitcher*, 117 F.3d 959,

964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)).

Courts must first ask whether the prosecutor's conduct or remarks were

improper.  *Slagle v. Bagley,* 457 F.3d 501, 515-16 (6th Cir. 2006), *cert. denied*, 127 S.

Ct. 2977, 168 L.Ed. 2d 708 (2007).  If the conduct or remarks were improper, a

reviewing court must consider whether the improper acts were so flagrant as to warrant

reversal.  *Id.* at 516.  The four factors used to consider when prosecutorial conduct or

remarks were flagrant are:  "(1) whether the evidence against the defendant was

strong[;] (2) whether the conduct of the prosecution tended to mislead the jury or

prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive;

and (4) whether the remarks were made deliberately or accidentally."  *Id.*  Prosecutorial

-misconduct claims also may be reviewed for harmless error.  *Bates v. Bell*, 402 F.3d

635, 641 (6th Cir. 2005).

15

### 2. Application

Petitioner alleges that the prosecutor repeatedly appealed to the jurors' sympathy for the victim, made factual statements not supported by the evidence, and elicited evidence that he was incarcerated when the police questioned him. The Michigan Court of Appeals adjudicated one of these claims (the prosecutor's appeal to the jurors' sympathy) and concluded that the prosecutor's errors were not outcome determinative. This Court believes that none of the prosecutor's errors were outcome determinative.

Although the prosecutor elicited testimony that Petitioner had been incarcerated on unrelated matters when the police interviewed him years after the crime, the jury was never informed of the nature of the prior convictions. Consequently, any prejudice to Petitioner was minimal. There was no basis for concluding that Petitioner must be guilty because he committed a similar crime in the past.

Petitioner also complains of the prosecutor's closing remarks. She stated that the victim's last hours of life must have been "horrifying" and not "quick and painless." The prosecutor also stated that the victim must have known that she was going to die and that escape was unlikely and perhaps she even pleaded with Petitioner. According to the prosecutor, the victim's "fight [was] probably gone," and she suffered even after her face was blown apart because she survived the gunshots. (Tr. June 23, 2000, at 5-9.)

These remarks were deliberately made, and they tended to elicit sympathy for the victim. The statements also were based on facts not in evidence, insofar as they speculated on the victim's thoughts and feelings during the crime.

The trial court, however, twice admonished the prosecutor in front of the jury "to

16

stick to the facts" and not "make up facts."  In addition, the trial court charged the jurors

not to let sympathy or prejudice influence their decision.  (*Id*. at 7 and 73.)

Defense counsel also asked the jurors not to be affected by sympathy, bias, or

prejudice.  He suggested to the jury that the prosecutor had appealed to the jurors'

sympathy because the stakes were high and the evidence was weak.  (*Id*. at 17.)  He

maintained that the victim was unconscious and dead within seconds of being shot.  (*Id*.

at 53-54.)

The Court concludes that, although the prosecutor's remarks were improper, the

remarks were not flagrant, given the strength of the evidence against Petitioner and

both the trial court's and defense counsel's response to the remarks.  In the alternative,

the remarks were harmless error in light of the overwhelming evidence against

Petitioner, namely, the DNA evidence and statements made to state policeman Robert

Piziali.

### E.  Peremptory Challenges and Retroactive Application of State Law

Petitioner alleges next that trial court deprived him of eight peremptory

challenges by applying state law retroactively in violation of the Ex Post Facto Clause of

the United States and Michigan Constitutions.  The trial court was the only state court to

review the substantive merits of this claim, and it found no merit in the claim.

Petitioner used only nine of his twelve peremptory challenges, and "there is no

freestanding constitutional right to peremptory challenges."  *Rivera v. Illinois*, __ S. Ct.

__, __, No. 07-9995, 2009 U.S. Lexis 2495, 2009 WL 815033, at *7 (U.S. Mar. 31,

2009).  Because states retain discretion to grant or withhold peremptory challenges,

"the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution. '[A] mere error of state law,' . . . ' is not a denial of due process.'" *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 121 n.21, 102 S. Ct. 1558, 71 L.Ed.2d 783 (1982)).

State courts, moreover, are entitled to determine the retroactivity of their own laws. *Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S. Ct. 145, 77 L.Ed. 360 (1932). Consequently, a state court's decision to limit the retroactive effect of a rule involving state law does not raise a cognizable question in habeas corpus proceedings. *See King v. Mintzes*, 559 F. Supp. 409, 412-13 (E.D. Mich. 1983) (Cook, J.). This is particularly true when the law in question concerns peremptory challenges. A statutory change which delimits the number of peremptory challenges in effect at the time of trial but not when the crime was committed is a procedural change involving no change in substantive law. *Simpson v. Wyrick*, 527 F. Supp. 1144, 1146 (W.D. Mo. 1981). Procedural changes, as opposed to substantive changes, in a statute do not violate the constitutional prohibition on *ex post facto* applications of law. *United States v. Gabrion*, 517 F.3d 839, 869 n.11 (6th Cir. 2008) (Nelson Moore, J., concurring) (citing *Dobbert v. Florida,* 432 U.S. 282, 293-95, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)), *cert. denied*, __ S. Ct. __, 2009 WL 901552 (U.S. Apr. 06, 2009) (No. 08-7512).

**F. The Autopsy Report**

The seventh habeas claim alleges that the trial court abused its discretion and violated Petitioner's right to due process by admitting hearsay evidence, namely, Dr. Arenheim's autopsy report, which was prepared in 1973. Dr. Arenheim was deceased

18

by the time of trial, and Petitioner alleges that the autopsy report was admitted without a proper foundation.  Petitioner further alleges that the trial court's admission of the report violated the Ex Post Facto Clause of the State and Federal Constitutions and his right to be confronted with the witnesses against him.

The trial court stated in its order denying Petitioner's post-conviction motion that it did not admit the autopsy report prepared by Dr. Arenheim in 1973.  The record, however, indicates that the 1973 autopsy report *was* admitted in evidence.  (Tr. June 20, 2000, at 170, 183, and 224.)  The report apparently stated that the victim died as a result of three gunshot wounds to the head, that the victim's skull was shattered, that a bullet fragment was found in her brain, and that she likely was sexually violated because there was seminal fluid in her vagina.  (*Id.* at 90-92.)

Whether or not the report was admitted in evidence is immaterial, because Petitioner stipulated to the fact that the victim died on July 3, 1973, and there was other evidence indicating that Dr. Arenheim swabbed the victim's vagina and preserved that evidence, as well as, fluid from the victim's body.  As defense counsel pointed out during his opening statement, the real issue was whether Petitioner caused the victim's death.

Petitioner's right to confront the witnesses against him was not violated by admission of the report, because "the factual observations in a medical examiner's autopsy report have sufficient 'indicia of reliability' to be admitted as a business record regardless of whether or not the examining pathologist testifies at trial."  *Tucker v. Bennett*, 219 F. Supp.2d 260, 266 (E.D. N.Y. 2002) (citing *United States v. Rosa,* 11 F.3d 315, 333 (2d Cir.1993), and *Manocchio v. Moran,* 919 F.2d 770, 777-78 (1st Cir.

19

1990)).  As such, Dr. Arenheim's factual observations were admissible.  *Id.*  To the

extent that the autopsy report included Dr. Arenheim's opinion on the cause and

manner of death and whether the victim was raped, Petitioner was not prejudiced,

because he was able to confront and cross-examine the medical examiner who

conducted an autopsy after the victim's body was exhumed.  Finally, even if

constitutional error occurred, the error could not have had a substantial and injurious

effect or influence on the jury's verdict, given the other evidence in the case.

### G.  Jail Credit

The eighth habeas claim alleges that Petitioner was denied sentencing credit  for

the time that he spent in jail awaiting trial.  The state court's alleged misinterpretation of

the State's crediting statute is a matter of state concern only.  *Howard v. White*, 76 Fed.

Appx. 52, 53 (6th Cir. 2003) (unpublished opinion citing *Travis v. Lockhart*, 925 F.2d

1095, 1097 (8th Cir.1991), and *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988)).

Therefore, Petitioner's challenge to his sentence fails to state a cognizable claim for

which habeas relief may be granted.

Even if the claim were cognizable, Petitioner was not prejudiced by the denial of

sentencing credits because any pretrial credits would not shorten his life sentence.

Moreover, he received credit on an out-of-state sentence that he was serving while

awaiting trial in this case.  He was not entitled to credit on both sentences.  *People v.*

*Givans*, 227 Mich. App. 113, 125-26; 575 N.W.2d 84, 90 (1997).

### H.  Trial and Appellate Counsel

The final two habeas claims allege ineffective assistance of trial and appellate

counsel.  Petitioner asserts that his trial attorney's omissions deprived him of the

20

counsel guaranteed him under the Constitution and that his appellate attorney should have raised certain issues in the appeal of right.  Petitioner contends that the cumulative effect of his attorneys' errors amounted to ineffective assistance of counsel.

The trial court was the last state court to review these claims on the merits.  It stated that Petitioner was afforded the best defense possible in view of the overwhelming evidence against him.  The trial court concluded that there was no ineffective assistance at either the trial court level or at the appellate court level.

### 1. Clearly Established Law

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), "qualifies as 'clearly established Federal law'" for purposes of evaluating ineffective-assistance-of-counsel claims.  *Williams*, 529 U.S. at 391.  Pursuant to *Strickland*, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  This requires showing "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688. Because of the difficulties inherent in evaluating defense counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)).

The prejudice prong of *Strickland* requires Petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the

21

proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### 2.  Trial Counsel

Petitioner alleges that his trial attorney should have objected to the prosecutor's remarks, to the admission of the autopsy report, to Ms. Travioli's testimony, and to testimony that he was incarcerated on unrelated matters when the police questioned him about this case.  Defense counsel did object to the prosecutor's reliance on facts not in evidence (Tr. June 23, 2000, at 6-7) and to the admission of the autopsy report (Tr. June 20, 2000, at 224).  Defense counsel also raised the husband-wife privilege and was successful in having Petitioner's communications to Ms. Travioli suppressed. (Tr. June 20, 2000, at 6-8 and 172.)  In addition, counsel was successful in suppressing Ms. Travioli's testimony regarding similar acts (Tr. Jan. 7, 2000, at 6)[1] and another victim's allegations that Petitioner raped her (Tr. Nov. 22, 1999, at 154).  Counsel attempted to suppress Ms. Travioli's testimony regarding Petitioner's ownership of guns, but the trial court denied that motion.  (Tr. June 21, 2000, at 124-25.)

Counsel did not object to the prosecutor's questions about whether Petitioner was incarcerated when the police interrogated him.  However, there was no mention of the nature of the prior conviction, and an objection would have emphasized the fact that there was a prior conviction.

Any deficiencies in counsel's performance did not prejudice Petitioner because he implicated himself in the crimes by admitting that he knew where the murder weapon

---

[1] Although some pages of this transcript of a pretrial conference are missing, the cited page indicates that Ms. Travioli would not be testifying about similar acts.

was and that he had used a different gun than the police suspected him of using.

Defense counsel's omissions either did not amount to deficient performance or did not

prejudice the defense.  The Court therefore concludes that Petitioner was not deprived

of the counsel guaranteed him under the Sixth Amendment.

### 3.  Appellate Counsel

Petitioner contends that his appellate attorney should have raised his claims

about the peremptory challenges, the prosecutor's conduct, the autopsy report, and

sentencing credits in the appeal of right.  The law on ineffective assistance of appellate

counsel has been summarized as follows:

> [a] criminal defendant has no constitutional right to demand that appellate counsel raise every possible colorable issue on appeal.  *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed.2d 987 (1983). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536, 106 S. Ct. 2661, 91 L. Ed.2d 434 (1986) (quoting *Jones*, 463 U.S. at 751-52, 103 S. Ct. 3308).

> Although the Sixth Amendment right to counsel does not require an appellate attorney to raise every non-frivolous issue on appeal, an attorney who has presented strong but unsuccessful claims on appeal may nonetheless deliver a deficient performance by omitting an issue that obviously would have resulted in reversal on appeal.  *Clemmons v. Delo*, 124 F.3d 944, 954 (8th Cir.1997); *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995); *see also Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (failure to raise a "dead-bang winner" claim on appeal constitutes ineffective assistance of appellate counsel even though counsel may have raised other strong but ultimately unsuccessful claims); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (appellate counsel may be ineffective where the trial error is obvious from the record and "must have leaped out upon even a casual reading of the transcript").  Although appellate counsel need not raise every nonfrivolous argument on direct appeal, he must exercise reasonable professional judgment. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (citing *Jones*, 463 U.S. at 751-752, 103 S. Ct. 3308).

23

*Allen v. Howes*, __ F. Supp.2d __, __, No. 05-10304, 2009 U.S. Dist. Lexis 14601, 2009 WL 483206, at *15 (E.D. Mich. Feb. 25, 2009) (Lawson, J.).

Petitioner contends that his appellate attorney should have raised his prosecutorial-misconduct claims in the appeal of right.  Appellate counsel did contest the use of Petitioner's silence as evidence and the prosecutor's comments evoking the jurors' sympathy.  The Michigan Court of Appeals rejected those claims and likely would have found no merit in Petitioner's other prosecutorial-misconduct claim – the prosecutor's mention of his status as a prisoner.  No prejudice resulted from the omission.

The other omitted issues were that Petitioner was deprived of peremptory challenges by retroactive application of state law, that Petitioner was deprived of sentencing credits, and that the autopsy report was erroneously admitted in evidence. These issues were not "deadbang winners."  The issue about the peremptory challenges had no merit because defense counsel expressed satisfaction with the jury before he used all his peremptory challenges.

The contention that Petitioner was entitled to sentencing credits was frivolous because he was sentenced to life imprisonment, and he apparently received credit on another state sentence for the time that he spent in jail awaiting trial in this case.  The challenge to the admission of the autopsy report lacks merit because Petitioner was permitted to cross-examine the medical examiner who performed the second autopsy.

Petitioner would not have received a reversal and new trial if he had raised all his claims in the appeal of right.  *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L.Ed. 2d 756 (2000) (requiring the petitioner to show that, but for his attorney's

24

omissions, he would have prevailed on his appeal).  Therefore, he has failed to

establish ineffective assistance of appellate counsel.

## IV.  CONCLUSION

The state court decisions in this case were not contrary to federal law, an

unreasonable application of federal law, or an unreasonable determination of the facts.

Accordingly, it is **ORDERED** that Petitioner's application for the writ of habeas

corpus [Docket No. 1, filed Jan. 31, 2006] is **DENIED**.  Reasonable jurists would not

disagree with the Court's assessment of Petitioner's constitutional claims, and the

issues do not warrant encouragement to proceed further.  The Court therefore declines

to issue a certificate of appealability.  *Banks v. Dretke*, 540 U.S. 668, 674, 124 S. Ct.

1256, 157 L.Ed. 2d 1166 (2004).  Petitioner nevertheless may appeal this Court's

decision *in forma pauperis* because an appeal could be taken in good faith.


S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  April 13, 2009

I hereby certify that a copy of the foregoing document was served upon Ronald
L. Stanton, EC Brooks Correctional Facility, 2500 S. Sheridan Dr., Muskegon heights,
MI 49444 and counsel of record on April 13, 2009, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager